UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

   Plaintiff,

 v.            Case No. 13-CR-00058 (CNC - AEG)

HUA JUN ZHAO,

   Defendant.

## SENTENCING MEMORANDUM

Hua Jun Zhao, by and through counsel Michelle L. Jacobs, Biskupic & Jacobs, S.C., hereby respectfully submits this sentencing memorandum in anticipation of the August 6th sentencing hearing.

**Introduction**

This Court should impose a time-served sentence of four months, or, if the Court deems supervision necessary upon Dr. Zhao's release, then a sentence of one year probation with a condition of the four months incarceration which has already been served. This recommendation is supported by the following:

1. The advisory Guidelines range is 6-12 months without any consideration of downward departures;

1

2. There are two strong bases warranting a downward departure which would reduce the Guidelines range to 0-6 months:

   a. Aberrant behavior under U.S.S.G. § 5K2.20, and

   b. The loss substantially overstates the seriousness of Dr. Zhao's conduct, particularly when the research data at issue here was created and developed by Dr. Zhao, and there is no evidence that he intended for that data to be lost; and

3. The section 3553(a) factors support a sentence which would result in Dr. Zhao's immediate release, particularly the strong support, both personal and professional, he has received; and in light of his exceptional cancer research work.

Such a sentence is entirely consistent with, and is sufficient but not greater than necessary to achieve the sentencing goals and purposes set forth in 18 U.S.C. § 3553(a).

## Basic Sentencing Procedures

This Court enjoys broad discretion to determine an appropriate sentence for Dr. Zhao. The sentence must be sufficient, but not greater than necessary, to comply with the purposes of sentencing. To make that determination, the Court first calculates the Guideline range, and then evaluates whether the facts and circumstances warrant a formal departure from that range. The advisory Guidelines range, including such departures, provides an initial benchmark for the Court's decision. The Court thereafter considers and analyzes the section 3553(a) factors in deciding on the ultimate sentence. *See* 18 U.S.C. § 3553(a); U.S.S.G. § 1B1.1(a)-(c); *United States v. Banas,* 712 F.3d 1006 (7th Cir. 2013); *United States v. Schmitz,* 717 F.3d 536 (7th Cir. 2013).

## Analysis of Guidelines and Section 3553(a) factors

Consistent with this procedure, this memorandum first addresses the Guidelines range and the two bases for downward departure, and then addresses the section 3553(a) factors, all of which support the recommended sentence of time served and Dr. Zhao's immediate release from custody.

### A. <u>The Advisory Sentencing Guidelines Before Departures</u>

The parties agreed in the plea agreement, and the PSR memo recommends, that the base offense level is six under U.S.S.G. § 2B1.1(a)(2); and that six levels are added under § 2B1.1(b)(1)(D),[1] for an offense level of 12. After a two-level reduction for acceptance of responsibility, Dr. Zhao's total offense level is 10. With no criminal history, the advisory Guidelines range before departures is anticipated to be 6-12 months. This recommended range is in Zone B, allowing a sentence of probation with the minimum term satisfied by alternative methods of confinement, such as home detention or community confinement.

Dr. Zhao will already have spent over four months in pretrial detention in the difficult circumstances of county jail facilities. A sentence just slightly below that range -- but one that will necessarily have involved actual incarceration rather than the less onerous forms of confinement -- will be sufficient to satisfy the purposes of sentencing.

---

[1] The parties have agreed in the plea agreement that a reasonable estimate of the value of developing the research data that Dr. Zhao copied on February 27th after his suspension (research data that was developed by Dr. Zhao, but which belonged to MCW) was between $30,000 and $70,000. See U.S.S.G. § 2B1.1, comment. n. 3(C)(ii). There has been no contention or evidence of further costs to MCW.

3

### B. <u>Downward</u> <u>Departures</u>

Effective November 1, 2010, the Sentencing Commission amended and reorganized U.S.S.G. §1B1.1. *See* U.S.S.G. App. C, Amendment 741. As is relevant here, section 1B1.1(b) now clarifies that the district court must "consider departures under the Guidelines themselves [prior to considering] other applicable factors under 18 U.S.C. § 3553(a)." *United States v. Guyton,* 636 F.3d 316, 319-20 n. 2 (7th Cir. 2011). In this instance, there are at least two bases on which the Court may -- and should -- depart downward from the otherwise applicable 6-12 months Guidelines range.

#### 1. A Downward Departure Is Warranted Under U.S.S.G. § 5K2.20.

The Court should depart downward under U.S.S.G. § 5K2.20 (Aberrant Behavior) as Dr. Zhao's criminal conduct marked a stark deviation from his otherwise law-abiding, serious, hard-working, pro-social, and productive adult life.

A defendant may be entitled to a downward departure for aberrant behavior in an exceptional case if he satisfies certain requirements. They are:

1. He committed a single criminal occurrence or single criminal transaction;
2. He did so without significant planning;
3. It was of limited duration;
4. It represented a marked deviation by him from an otherwise law-abiding life;
5. He has no criminal history; and
6. The offense did not involve serious bodily injury or death, did not involve use of a firearm or dangerous weapon, and was not a drug trafficking crime.

*See* U.S.S.G. § 5K2.20. In determining whether to depart, the Court may consider the defendant's mental and emotional condition, his employment record, his record

4

of prior good works, his motivation for committing the offense, and any efforts he made to mitigate the effects of the offense. *Id*. at comment., n.3.

Dr. Zhao satisfies all of these criteria. The offense here involved a single, entirely unplanned incident. The offense was of extremely limited duration, occurring in the immediate aftermath of Dr. Zhao's suspension, when MCW officials confiscated his personal laptop and personal papers, and his external hard drive containing the most recent version of his research data.

Dr. Zhao has never had a criminal arrest or conviction, and has lived an entirely law-abiding life. He has a stellar employment history, devoting most of his professional life to cancer research. The letters submitted in support of Dr. Zhao demonstrate this stellar background and commitment to a pro-social life. Dr. Zhao's motivation for committing the offense as described more fully below, albeit misguided, had everything to do with preserving and continuing that life's work. And, he made efforts to mitigate the offense immediately upon realizing the gravity of his mistake.

All of these factors support the request for a downward departure of at least two levels to account for the aberrant nature of Dr. Zhao's conduct. With such a departure, the applicable Guidelines range would be just 0-6 months.

### 2. The Loss Overstates Seriousness and Fails to Capture Dr. Zhao's Intent and Motive

This Court also should depart downward from the otherwise applicable Guidelines because U.S.S.G. § 2B1.1(b)(1)(D) overstates the seriousness of the offense here, particularly because MCW suffered no loss, and Dr. Zhao did not

5

intend for MCW to suffer a loss.  U.S.S.G. § 2B1.1, comment., n.19(C).  *See generally United States v. Stuart,* 22 F.3d 76, 83 (3d Cir. 1994), *cited in United States v. Forchette,* 220 F. Supp. 2d 914, 929 (E.D. Wis. 2002). *See also* Allen Ellis, John R. Steer, Mark Allenbaugh, *At a "Loss" for Justice:  Federal Sentencing for Economic Offenses,* 25 Crim. Just. 34, 37 (2011) ("While the fraud guideline focuses primarily on aggregate monetary loss and victimization, it fails to measure a host of other factors that may be important, and may be a basis for mitigating punishment, in a particular case."); and *United States v. Ovid,* 2010 WL 3940724, *1 (E.D.N.Y. Oct. 1, 2010)("[T]he fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so.").

The Guidelines suggest that loss be measured by the cost of developing the information at issue.  Dr. Zhao developed the research data in his capacity as a research scientist with MCW, through hard work, scientific creativity and talent.  The data he copied, and the files he deleted, were his own work product, although they belonged to MCW.  Dr. Zhao did not derive, or intend to derive, any pecuniary gain whatsoever from the offense, nor did he intend for MCW or anyone to suffer a pecuniary loss.  Nor did MCW suffer a loss.  MCW was in possession of the most up-to-date copy of all of Dr. Zhao's research data, the file which was deleted was an older version of the data, and all of MCW's electronic information was restored.  In sum, although the "loss" under U.S.S.G. § 2B1.1 is properly calculated, it substantially overstates the severity of Dr. Zhao's criminal conduct.  He did not

6

intend to cause pecuniary loss to anyone. His motive and intent, as described below, were to ensure the integrity of his research data and other information and devices, and continue his work to finish the C-25 paper.

MCW officials had just seized Dr. Zhao's personal laptop, his personal papers, a flash drive, and his external hard drive. The external hard drive contained Dr. Zhao's most up-to-date C-25 research data for the paper he was expected to produce by March 15th. His personal laptop and other devices did not contain any of the MCW information at issue, but did contain substantial amounts of other work, research data and information he was currently working on with colleagues at University of Cincinnati, his immigration paperwork and documents, and volumes of other documents and items personally important to Dr. Zhao.

As a result of the seizure, Dr. Zhao was, perhaps understandably, panicked about the integrity of these devices. It was that panic that caused him to make the mistake of returning to MCW without authorization, after his suspension. He did not return to MCW with the intent to destroy anything. Instead, he wanted to ensure the integrity of and protect the devices and data. When he got there, he discovered that his laptop, external hard drive, and other property were not at his work station. He found a flash drive which he used to copy his (older version of) C-25 research data. He was at the lab that night for approximately two hours, during which he checked on cell lines, ran experiments, and continued his MCW work.

Dr. Zhao also was concerned that MCW officials may become upset if they discovered that he had an older version of the research data on the MCW

7

computers, and that he had been storing his updated version of the data on the external device rather than on the MCW computers. It was that concern or fear that prompted him to delete the data. He believed that he would be back at MCW in the days to come, and could update and organize the MCW data using the newest data contained on the external hard drive.

When he left and returned home that night, he realized he had made a terrible mistake in deleting the data. In an attempt to rectify the situation, Dr. Zhao emailed Dr. Anderson in the early morning hours of February 28th, and offered to assist in organizing and updating the data upon his return after the suspension. But rather than being allowed to return, Dr. Zhao was summoned on March 1st to the meeting with MCW officials and the FBI.

Dr. Zhao's intent in returning to MCW that night -- albeit clearly misguided -- was to preserve his research data, and find a way to continue to work despite his suspension, so that he could meet Dr. Anderson's deadline (3/15/2013) for the paper. Although his decision to return to the lab and his deletion of his old research files were incredibly misguided, they were not malicious. He did these things at a time when he was suspended -- not terminated -- and at a time when he believed he would be returning to work in the days to come. He had absolutely no motive to destroy his own work, destroy his relationship with Dr. Anderson, or destroy his (imminent) opportunity to publish this first-author paper.

All of these factors suggest that the "loss" figure here, and the attendant six-level increase in the Guidelines, do not fairly measure the severity of the offense or

8

Dr. Zhao's culpability. On that basis, this Court should depart downward from the otherwise applicable Guidelines range. With just a two-level departure, Dr. Zhao's Guidelines range will be 0-6 months.

C.     **Section 3553(a) factors**

The section 3553(a) factors, considered in conjunction with the advisory Guidelines range of either 6-12 months or a lesser range reflecting one or both downward departures, strongly support a sentence of either probation or time-served.

1.     **Dr. Zhao's History and Characteristics**

Dr. Hua Jun Zhao is a 41 year old husband and father of two young sons, Jing Hao Zhao ("Michael"), age 11 years; and Yu Hao Zhao ("Aaron"), age 10 months. Dr. Zhao's wife of 11+ years, Ling Yu, resides in China with their sons, and has been employed as a nurse at First Affiliated Hospital of Zhejiang University for 15 years. She travels periodically to the United States to visit her husband, and likewise Dr. Zhao travels to China periodically to be with his family. Their youngest son was born in the United States in the fall of 2012, and thus is a United States citizen. Dr. Zhao and Michael both received lawful permanent resident status in November 2012. And, in January 2013, his wife obtained her lawful permanent resident status in the United States. It was the couple's goal to have their children educated in the United States.

Dr. Zhao's parents are both deceased. His father, Keyuan Zhao, died in 2011. His mother, Zhaogu Zhou, died in 2000. Prior to their passing, the two resided in a

9

small, agrarian village in China where they raised six children. Dr. Zhao is the youngest of the six children. His three older brothers live in small villages in China and are employed as a truck driver, construction worker, and raising ducks. His two sisters similarly reside in small villages. One is a housewife, and the other works in a garment factory.

Dr. Zhao earned his Bachelor of Science degree in 1996 from the College of Pharmaceutical Sciences at Zhejiang University, Hangzhou, where he was awarded an Excellent Undergraduate Award. After graduation, Dr. Zhao was employed for four years as a Clinical Pharmacist at Zhejiang Provincial Hospital.

From 2000 to 2006, Dr. Zhao studied and earned his PhD at the Chinese Academy of Sciences, Shanghai Institute of *Materia Medica,* Division of Anti-Tumor Pharmacology. He studied cancer drug discovery and development with Dr. Jian Ding. Dr. Zhao graduated in March 2006, and earned his PhD in 2007. During his time there, he was awarded the Excellent Scientific Article Award at the 2005 Ninth National Tumor - Pharmacology and Chemotherapy Conference. In his letter in support of Dr. Zhao, Dr. Ding describes him as a very diligent scientist and "unfailingly courteous and helpful." He also notes that Dr. Zhao's work is "widely accepted by international society and published in an international peer-reviewed journal *Cancer Research.*"

Dr. Zhao made the difficult decision to leave his wife and son in China, to come to the United States in 2006 to do his post-doctoral studies. He worked for several months at the University of Louisville doing research on reproductive

10

systems, until he was hired as a post-doctoral fellow at the H. Lee Moffitt Cancer Center and Research Institute in Tampa, Florida. He was employed by the Cancer Center from 2006 to 2007, doing work on drug discovery and pharmacology.

Dr. Zhao was next hired as a post-doctoral fellow at the University of Cincinnati Medical Center, from 2007 to 2011, where he conducted research on breast cancer and drug pharmacology. He worked closely with Dr. Shao Chun Wang, and studied certain protein interactions related to breast cancer and certain drug resistance issues. Dr. Wang describes Dr. Zhao as a very serious, dedicated, focused, and extremely productive research scientist. According to Dr. Wang, Dr. Zhao published a remarkable five first-author papers in just four years while at the University of Cincinnati. He was extremely reliable, diligent, and was a tremendously hard worker.

Those demonstrated traits continued in Dr. Wang's and Dr. Zhao's professional dealings after Dr. Zhao left University of Cincinnati, as the two continued to collaborate on research papers based upon Dr. Zhao's work there.

Finally, Dr. Zhao was hired at the Medical College as a research scientist in MCW's Department of Medical, Cancer Center, in August 2011 where he remained employed until February 2013 when this case arose. He worked with Dr. Marshall Anderson. In September 2012, while employed with MCW, his wife gave birth to their second son.

By all accounts, Dr. Zhao worked tremendously hard during his years in the United States, to include his MCW employment. He often worked seven days per

11

week, and up to 16 hours per day, on his research at the lab and from home. Dr. Zhao is an extremely accomplished research scientist. His CV reflects numerous publications and research on cancer resistance and cancer pharmacology, and oral presentations to include the 2010 American Association for Cancer Research (AACR) Annual Meeting in Washington D.C. in 2010. *See* Exhibit B. Dr. Zhao is passionate about his research, and plans to continue his work upon his release from custody.

Another testament to Dr. Zhao's accomplishments and skills as a research scientist, and the importance of his work to the medical community and society in general, is the July 11, 2012 letter written by Dr. Anderson in connection with Dr. Zhao's 2012 application for lawful permanent resident status. *See* Exhibit A. The letter describes the unique and exceptional research Dr. Zhao has conducted, and the "key contributions" Dr. Zhao has made "to developing a cure for breast and prostate cancer." Dr. Anderson describes Dr. Zhao as "leading the charge" nationally in cancer research, and as "one of a select few individuals nationwide" working successfully in this area. "Dr. Zhao's outstanding ability, highlighted by his ingenuity, sagacity and instinct are what make him remarkable and ultimately, valuable to advancement and search for a cure to cancer."

But as passionate as Dr. Zhao is for his research, he is also passionate about the United States. He very much wants his children to be educated here. He also intended to remain employed in the United States. He knew that Dr. Anderson was going to be retiring within the year, and thus had begun to search for a new

position. Although he had received a job offer from a university in China, he was more interested in a position in the United States. He continued to look for work here, both before and after the incident at MCW. For example, in the letter from Mr. William Stuart, Mr. Stuart indicates that Dr. Zhao had asked him for assistance in early February 2013 (before this incident) in finding a job and a house in the United States. Dr. Zhao's personal emails also reflect that both before and after his suspension and termination, he continued to look for a research position in the United States.

Dr. Zhao enjoys a supportive group of friends whom he met in Milwaukee through The Church of Milwaukee, 9414 West Bluemound Road. In particular, Dr. Zhao became friends with Yang "Scarlet" Shi and Fang-Yao "Steven" Hou, both of whom are very active members of the church. Ms. Shi and Mr. Hou are expected to attend the sentencing hearing and may wish to address the court on Dr. Zhao's behalf. He also has a large group of supporters and friends in other areas of the country and in China, many of whom have submitted letters in support of him.

Dr. Zhao has lived his entire life respectful of the law and as a contributing member of his community. He has continuously been enrolled in college or graduate school, conducting post graduate research, or professionally employed in the medical field his entire adult life. He has a supportive, caring family and many friends. Dr. Zhao is remorseful for his wrongful action, and hopes that upon his release, he will be able to reunite with his family and continue his work as a cancer research scientist, either in the United States or in China.

13

### 2. Nature of the Offense

As described above, Dr. Zhao is extremely remorseful and accepts responsibility for his conduct. The cancer research information and data at issue were produced by Dr. Zhao himself. His motivations -- to preserve the integrity of his research data, continue his work, and stay out of trouble with MCW -- were misguided, of course, but also support the recommended sentence as he did not intend to damage or destroy his data, and did not intend to harm MCW.

Even if this Court determines that a formal downward departure is not warranted here, the Court still should consider under section 3553(a) the aberrant nature of Dr. Zhao's conduct, and these motivations and intentions regarding loss.

### 3. Protection of the Public, Just Punishment, Promoting Respect for the Law, Deterrence, and Treatment Needs

There is absolutely no indication here that any additional incarceration is necessary to protect the public. To the contrary, the public will benefit from Dr. Zhao's release from custody and continuation of his research.

Dr. Zhao has no history of alcohol or substance use or abuse. He has no educational or vocational training needs, no medical needs, nor any type of correctional treatment needs.

Likewise, no additional incarceration is needed to address deterrence or punishment. Dr. Zhao has acknowledged making a mistake -- a tremendously poor lapse in judgment -- when he returned to MCW after being suspended. But he has paid severely and dearly for that mistake. He has spent four months detained in a county jail almost 7,000 miles from his wife and children with little or no ability to

14

have contact with them. He has lost his job, about which he is obviously very passionate. He lost his ability to continue his research work. He had just become a lawful permanent resident, and may ultimately lose that status, be deported, or be forever prevented from returning to the United States.[2] There is absolutely no marginal benefit which would be derived from sentencing him to any additional time in custody. To the contrary, society will benefit from Dr. Zhao's release, so that he may continue his medical research and support his family.

### 4. Avoiding unwarranted disparity

A review of several computer or intellectual property related cases and sentences in the Eastern and Western Districts of Wisconsin demonstrates that the requested sentence would not create unwarranted disparity.

For example, in *United States v. Robert Koster,* 07-CR-26 (E.D. Wis.), the defendant pled guilty to a five-year, copyright infringement felony, and was sentenced to 120 days (4 months), three years of supervised release and restitution of $23,022.64. His conduct included initiating at least 105 separate online auctions of copyrighted software for personal profit over a 10-day period. And, in *United States v. Yutaka Yamamoto*, 07-CR-28 (E.D. Wis), the defendant pled guilty to copyright infringement. He received 30 days' imprisonment, three years of supervised release, and a restitution order. His conducted included initiating 92

---

[2] Dr. Zhao understands that there is no guarantee as to the immigration/deportation consequence, if any, which may result from this conviction. However, there is some indication that the offense will not result in deportation because of the length of time Dr. Zhao legally had been in the United States prior to the offense. However, if he is allowed to remain in the United States, there is also some indication that this conviction may deem him "inadmissible" which means that if he traveled outside of the U.S. at any time (to China, for example, to see his family) then he would be prohibited from returning to the United States.

15

such auctions over an eight-month period, again for personal profit. In contrast, here there was no loss to MCW, and Dr. Zhao's conduct included a single incident.

In *United States v. Summit Refrigeration Group Inc., et al.,* 05-CR-151 (E.D. Wis.), a corporation and three individuals were charged with conspiracy and substantive felony trade secret violations. According to the indictment, the individuals physically stole from their former employer voluminous trade secret documents and information, which they used to benefit of their new company. The information included operations and maintenance manuals, customer files, bidding information, information developed by the former employer over years, back up disks of documents, documents explicitly marked with intellectual property warnings, copies of emails between customers and the former employer on pending projects, labor cost analyses, etc. The defendants also used this trade secret material to hire away employees, interfere with contracts and customer relationships, among other wrongs. After protracted litigation in the criminal case, the individual defendants were allowed to plead guilty to misdemeanors, and the government dismissed against the corporation altogether. They received probationary sentences, with an order to repay $1.4 million in restitution.

As another example, in *United States v. Schuster,* 04-CR-175 (W.D. Wis.), the defendant was fired from his job with a computer support services business. He was told not to access the company's network again, but ignored the directive and continued to do so for months, using the addresses of legitimate customers to gain access. Eventually, because his use interfered with customers' ability to gain

16

access, the customers complained and the company discovered his misuse. They closed him out of their system temporarily, but irritated by this, he took further steps to interfere with the customer's ability to use the system. He changed passwords, caused them to incur "denial of service" attacks, called an employee to taunt him, etc. He eventually was charged and pled guilty to a violation of 18 U.S.C. § 1030. His Guidelines range was 15-21 months, which included no reduction for acceptance of responsibility. He received 15 months' prison, and was ordered to pay $19,600 in restitution. In contrast, Dr. Zhao's conduct lasted a couple of hours at most, he immediately tried to rectify the situation with emails to Dr. Anderson, he timely agreed to plead guilty, he has served over 4 months in custody already, and he caused no loss to MCW.

These sentences demonstrate that the four-month, time-served sentence, will not create unwarranted disparities.

## Conclusion

The section 3553(a) factors, including the nature and circumstances of the offense and the history and characteristics of Dr. Zhao, demonstrate that a time-served sentence will be sufficient to satisfy the purposes of sentencing. Such a sentence would also be consistent with the Sentencing Guidelines, provide just

punishment, and promote deterrence. It is respectfully recommended that this Court impose a time-served sentence and immediately release Dr. Zhao.

Respectfully submitted this 30th day of July, 2013.

**BISKUPIC & JACOBS, S.C.**

By: /s/ Michelle L. Jacobs
Michelle L. Jacobs, SBN 1021706
1045 West Glen Oaks Lane, Suite 106
Mequon, WI 53092
mjacobs@biskupicjacobs.com
Office: 262-241-3300
Fax: 866-700-7640

Attorney for Hua Jun Zhao